IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

CHARLESTON DIVISION

MELVIN LLOYD SCHNURPEL, JR.,

      **Plaintiff,**

v.                                **Case No.: 2:16-cv-06042**

NANCY A. BERRYHILL,
**Acting Commissioner of the**
**Social Security Administration,**

      **Defendant.**

**PROPOSED FINDINGS AND RECOMMENDATIONS**

      This action seeks a review of the decision of the Commissioner of the Social Security Administration (hereinafter "Commissioner") denying Plaintiff's applications for a period of disability and disability insurance benefits ("DIB") and supplemental security income ("SSI") under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 401-433, 1381-1383f. The matter is assigned to the Honorable Joseph R. Goodwin, United States District Judge, and was referred to the undersigned United States Magistrate Judge by standing order for submission of proposed findings of fact and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B). Presently pending before the court are the parties' separate requests for judgment on the pleadings, as articulated in their briefs. (ECF Nos. 10, 11).

      The undersigned has fully considered the evidence and the arguments of counsel. For the following reasons, the undersigned **RECOMMENDS** that Plaintiff's request for judgment on the pleadings be **GRANTED**, to the extent that is requests remand of the

Commissioner's decision; that the Commissioner's motion for judgment on the pleadings be **DENIED**; that the decision of the Commissioner be **REVERSED** and **REMANDED** pursuant to sentence four of 42 U.S.C. § 405(g); and that this case be **DISMISSED**, **with prejudice,** and removed from the docket of the Court.

## I. <u>Procedural History</u>

On April 25, 2013, Plaintiff Melvin Lloyd Schnurpel, Jr., ("Claimant"), completed applications for DIB and SSI, alleging a disability onset date of June 1, 2012, (Tr. at 30), due to "[k]idney cancer-stage being determined, excruciating back pain [and] hip pain, lung problems, depression and anxiety, diabetes, chronic lung problems-shortness of breath, angina, loss of concentration and drowsiness from pain meds, sleeplessness, difficulty raising arms and legs, [and] difficulty grasping due to trembling hands." (Tr. at 270). The Social Security Administration ("SSA") denied Claimant's applications initially and upon reconsideration. (Tr. at 128-32, 134-37). Claimant filed a request for an administrative hearing, which was held on December 30, 2014 before the Honorable John T. Molleur, Administrative Law Judge ("ALJ"). (Tr. at 45-88). By written decision dated January 12, 2015, the ALJ found that Claimant was not disabled as defined by the Social Security Act. (Tr. at 30-40). The ALJ's decision became the final decision of the Commissioner on May 25, 2016, when the Appeals Council denied Claimant's request for review. (Tr. at 1-3).

Claimant timely filed the present civil action seeking judicial review pursuant to 42 U.S.C. § 405(g). (ECF No. 2). The Commissioner subsequently filed an Answer opposing Claimant's complaint and a Transcript of Proceedings. (ECF Nos. 8, 9). Claimant then filed a Brief in Support of Judgment on the Pleadings. (ECF No. 10). In response, the Commissioner filed a Brief in Support of Defendant's Decision, (ECF No. 11), to which

Claimant filed a reply memorandum. (ECF No. 12). Consequently, the matter is fully briefed and ready for disposition.

## II.    <u>Claimant's Background</u>

Claimant was 48 years old at the time of his alleged onset of disability and 51 years old at the time of the ALJ's decision. (Tr. at 30, 220). He has at least a high school education and communicates in English. (Tr. at 269, 271). He previously worked as a truck driver, tax preparer, and telemarketer. (Tr. at 54, 272).

## III.    <u>Summary of ALJ's Decision</u>

Under 42 U.S.C. § 423(d)(5), a claimant seeking disability benefits has the burden of proving a disability. *See Blalock v. Richardson,* 483 F.2d 773, 775 (4th Cir. 1972). A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable impairment which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).

The Social Security regulations establish a five-step sequential evaluation process for the adjudication of disability claims. If an individual is found "not disabled" at any step of the process, further inquiry is unnecessary and benefits are denied. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). The first step in the sequence is determining whether a claimant is currently engaged in substantial gainful employment. *Id.* §§ 404.1520(b), 416.920(b). If the claimant is not, then the second step requires a determination of whether the claimant suffers from a severe impairment. *Id.* §§ 404.1520(c), 416.920(c). A severe impairment is one that "significantly limits [a claimant's] physical or mental ability to do basic work activities." *Id*. If severe impairment is present, the third inquiry is whether this impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4 (the "Listing"). *Id.* §§ 404.1520(d),

416.920(d). If so, then the claimant is found disabled and awarded benefits.

However, if the impairment does not meet or equal a listed impairment, the adjudicator must assess the claimant's residual functional capacity ("RFC"), which is the measure of the claimant's ability to engage in substantial gainful activity despite the limitations of his or her impairments. *Id.* §§ 404.1520(e), 416.920(e). After making this determination, the fourth step is to ascertain whether the claimant's impairments prevent the performance of past relevant work. *Id.* §§ 404.1520(f), 416.920(f). If the impairments do prevent the performance of past relevant work, then the claimant has established a *prima facie* case of disability, and the burden shifts to the Commissioner to demonstrate, in the fifth and final step of the process, that the claimant is able to perform other forms of substantial gainful activity, given the claimant's remaining physical and mental capacities, age, education, and prior work experiences. 20 C.F.R. §§ 404.1520(g), 416.920(g); *see also McLain v. Schweiker*, 715 F.2d 866, 868-69 (4th Cir. 1983). The Commissioner must establish two things: (1) that the claimant, considering his or her age, education, skills, work experience, and physical shortcomings has the capacity to perform an alternative job, and (2) that this specific job exists in significant numbers in the national economy. *McLamore v. Weinberger*, 538 F.2d 572, 574 (4th Cir. 1976).

When a claimant alleges a mental impairment, the SSA "must follow a special technique at each level in the administrative review process," including the review performed by the ALJ. 20 C.F.R. §§ 404.1520a(a), 416.920a(a). Under this technique, the ALJ first evaluates the claimant's pertinent signs, symptoms, and laboratory results to determine whether the claimant has a medically determinable mental impairment. *Id.* §§ 404.1520a(b), 416.920a(b). If an impairment exists, the ALJ documents the findings. Second, the ALJ rates and documents the degree of functional limitation resulting from

the impairment according to criteria specified in *Id.* §§ 404.1520a(c), 416.920a(c). Third, after rating the degree of functional limitation from the claimant's impairment(s), the ALJ determines the severity of the limitation. *Id.* §§ 404.1520a(d), 416.920a(d). A rating of "none" or "mild" in the first three functional areas (activities of daily living, social functioning, and concentration, persistence or pace) and "none" in the fourth (episodes of decompensation of extended duration) will result in a finding that the impairment is not severe unless the evidence indicates that there is more than minimal limitation in the claimant's ability to do basic work activities. *Id.* §§ 404.1520a(d)(1), 416.920a(d)(1). Fourth, if the claimant's impairment is deemed severe, the ALJ compares the medical findings about the severe impairment and the rating and degree and functional limitation to the criteria of the appropriate listed mental disorder to determine if the severe impairment meets or is equal to a listed mental disorder. *Id.* §§ 404.1520a(d)(2), 416.920a(d)(2). Finally, if the ALJ finds that the claimant has a severe mental impairment, which neither meets nor equals a listed mental disorder, the ALJ assesses the claimant's residual mental functional capacity. *Id.* §§ 404.1520a(d)(3), 416.920a(d)(3). The regulations further specify how the findings and conclusion reached in applying the technique must be documented by the ALJ, stating:

> The decision must show the significant history, including examination and laboratory findings, the functional limitations that were considered in reaching a conclusion about the severity of the mental impairment(s). The decision must include a specific finding as to the degree of limitation in each functional areas described in paragraph (c) of this section.

20 C.F.R. §§ 404.1520a(e)(4), 416.920a(e)(4).

Here, the ALJ determined as a preliminary matter that Claimant met the insured status for disability insurance benefits through December 31, 2014. (Tr. at 32, Finding No. 1). At the first step of the sequential evaluation, the ALJ confirmed that Claimant had not

engaged in substantial gainful activity since June 1, 2012, the alleged disability onset date. (*Id.* at No. 2). At the second step of the evaluation, the ALJ found that Claimant had the following severe impairments: "degenerative disc disease of the lumbar spine, diabetes mellitus, status post cancer of the kidney with partial nephrectomy, and left shoulder impingement." (Tr. at 32-34, Finding No. 3). The ALJ considered and found non-severe Claimant's emphysema, tremor, depression/dysthymia, and personality disorder. (Tr. at 32-33, Finding No. 3).

Under the third inquiry, the ALJ found that Claimant did not have an impairment or combination of impairments that met or medically equaled any of the impairments contained in the Listing. (Tr. at 34-35, Finding No. 4). Accordingly, the ALJ determined that the Claimant possessed:

> [T]he residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except all postural activities are limited to occasional. Pushing and pulling with the left upper extremity is limited to frequent with the weight limitations of light work. Overhead reaching with the left upper extremity is limited to occasional. There should be no direct exposure to vibrations and no concentrated exposure to extremes of cold.

(Tr. at 35-38, Finding No. 5).

At the fourth step, the ALJ determined that Claimant was unable to perform any past relevant work. (Tr. at 38-39, Finding No. 6). Under the fifth and final inquiry, the ALJ reviewed Claimant's past work experience, age, and education in combination with his RFC to determine his ability to engage in substantial gainful activity. (Tr. at 39-40, Finding Nos. 7-10). The ALJ considered that (1) Claimant was defined as a younger individual age 18-49 on the alleged disability onset date; (2) he had at least a high school education and could communicate in English; and (3) transferability of job skills was not material to the determination of disability because the Medical-Vocational Rules

supported a finding that Claimant is "not disabled," regardless of his transferable job skills. (*Id.* at Finding Nos. 7-9). Given Claimant's age, education, work experience, and RFC, the ALJ determined that Claimant could perform jobs that existed in significant numbers in the national economy, including work as a hand packer, price marker, or sorter at the light, unskilled exertional level. (Tr. at 39-40, Finding No. 10). Therefore, the ALJ found that Claimant was not disabled and was not entitled to benefits. (Tr. at 40, Finding No. 11).

## IV.    **Claimant's Challenge to the Commissioner's Decision**

Claimant raises two challenges to the Commissioner's decision. First, Claimant argues that the ALJ failed to adequately assess his multiple mental impairments. Specifically, Claimant contends that the ALJ erroneously concluded at step two that his mental impairments were not severe despite statements from Claimant's treating physician, an agency examiner, and agency reviewing sources, all of which concluded that Claimant's affective disorders were severe. (ECF No. 10 at 11). Further, Claimant asserts that the ALJ did not meaningfully discuss or examine the weight to afford to the opinions of the consultative psychologist, J. Lawrence Muirhead, Ph.D. (*Id.* at 13). Claimant posits that the ALJ's failure to discuss and reconcile Dr. Muirhead's findings regarding Claimant's deficits in concentration and short-term memory with the ALJ's own findings in those areas was particularly troubling. (*Id.*). In his second challenge, Claimant argues that, despite the evidence demonstrating Claimant's reliance on a cane or walker, the ALJ failed to account for this difficulty with ambulation in Claimant's RFC finding, resulting in an erroneous determination that Claimant was capable of light work. (*Id.* at 15-17).

In response, the Commissioner points out that her decision is entitled to substantial deference under the applicable judicial standard of review. Moreover, she

contends that that the ALJ complied with Social Security rules and regulations when considering Claimant's mental impairments, and substantial evidence supports the ALJ's RFC assessment. (ECF No. 11). In his reply to these arguments, Claimant emphasizes his belief that the Commissioner selectively cited portions of the record in an effort to gloss over the ALJ's failure to discuss relevant evidence and to provide post-hoc support for the ALJ's findings. (ECF No. 12).

## V. <u>Relevant Medical Evidence</u>

The undersigned has reviewed all of the evidence before the Court, including the numerous records reflecting Claimant's health care examinations, evaluations, and treatment. Following is a summary of the medical information most relevant to Claimant's challenges.

### A. *Treatment Records*

In July 2012, a licensed clinical social worker at the Department of Veteran Affairs ("VA"), Southern Nevada HCS, reported that Claimant had thoughts of suicide due to not being able to provide for his wife and himself. (Tr. at 384). His main concern was impending homelessness. (Tr. at 384-85). Claimant's mood and affect were depressed, and he reported pain in his back and hip that was 7 on a 10-point pain scale. (Tr. at 385). He (*Id.*). The VA assisted Claimant and his wife in finding emergency housing. (Tr. at 384). When Claimant saw another licensed clinical social worker the following day, his mental status examination was normal, including "good" mood and congruent affect. (Tr. at 382).

Days later, Claimant presented to the VA for primary care services. (Tr. at 375-80). Claimant advised that he had not seen a physician in three years, although he was a diabetic. (Tr. at 379). He explained that he had previously taken medication to control his

diabetes, but had not done so for approximately a year. (Tr. at 380). On examination, Claimant had no musculoskeletal issues, and he denied muscle cramps, joint pain, and stiffness. (Tr. at 377). He was able to move all extremities. (Tr. at 378). Claimant's diagnoses included history of chest pain, cephalgia, diabetes, dyslipidemia, and adjustment disorder. (Tr. at 378).

In August 2012, Claimant presented to the VA for follow-up care. (Tr. at 357). He was described as looking "frail." Claimant complained of generalized weakness, but walked without an assistive device. (*Id.*). He was diagnosed with right lung mass, right kidney mass, nephrolithiasis, diabetes, Gastroesophageal Reflux Disease (GERD), dyslipidemia, tobacco use, insomnia, and high blood pressure. (Tr. at 357-58). Claimant was instructed to obtain lab work and return to the clinic in one month or sooner, if needed. (Tr. at 358).

That same month, Claimant returned to the VA, complaining of a backache for the past week in the bilateral flank area, but surmised that it might be a kidney stone trying to pass. (Tr. at 367). He reported having an episode of chest pain two weeks earlier that resolved with nitroglycerin. His blood sugar was tested and registered in the high range. Claimant admitted being noncompliant with diet restrictions due to his current financial situation. However, Claimant responded to questions appropriately, although he was guarded in posture and nature, and had a notable hand tremor. (Tr. at 369). Claimant received a score of "0" on the PHQ-2 depression screen, indicating that he was not depressed. (Tr. at 373). Furthermore, he denied feeling down or hopeless "at all" and did not have any decreased interest or pleasure in doing things. (Tr. at 374).

In November 2012, Claimant presented to the VA Medical Center ("VAMC") in Dallas, Texas with a "new complaint" of low back pain without radiculopathy that

developed over the past six months. (Tr. at 1210). An x-ray of his thoracic spine was normal and an x-ray of his lumbar spine showed minimal arthritic changes. (Tr. at 1211). Shortly thereafter, in January 2013, Claimant complained of worsening anxiety and depression, primarily due to his medical problems. (Tr. at 1171). He was started on Zoloft and was told to consult with the VA's mental hygiene clinic. (Tr. at 1172). Claimant also presented for a chiropractic consultation that month, complaining of mid-to-low back pain. (Tr. at 465). He stated that the pain began in 2009 and was probably caused by his prior job as a truck driver. (*Id.*). Claimant also reported that, since November 2012, his left shoulder had hurt whenever he raised his arm overhead. (*Id.*). An x-ray of his left shoulder showed no fracture or dislocation, no soft tissue calcification, and his joint spaces were maintained. (Tr. at 410). On examination, Claimant had normal gait, station, and coordination. (Tr. at 468). The range of motion of his cervical spine and trunk was mildly decreased. (*Id.*). Claimant's diagnoses were segmental dysfunction of his spine related to degenerative disk disease or degenerative joint disease; left shoulder impingement syndrome; masses in the lung and kidneys; and worsening intention tremor. (Tr. at 470).

The following month, Claimant had a MRI of his lumbar spine to evaluate his severe right-sided lumbar pain, which had reportedly increased over the past two years. (Tr. at 407). The MRI showed mild degenerative changes of spondylosis at L5-S1 without evidence of neural impingement or displacement. (*Id.*). Claimant also had a MRI of his thoracic spine to evaluate pain in that region and his difficulty standing erect. (Tr. at 408). The MRI showed no significant abnormality of his thoracic spine and an absence of significant thecal sac or neural foraminal narrowing of the spine. (Tr. at 407, 409).

Also in February 2013, Claimant underwent a successful partial open nephrectomy

to remove a tumor from his right kidney. (Tr. at 496, 598, 720). His pre-procedure notes indicate that Claimant did not use ambulatory aid and had a normal gait. (Tr. at 942). At discharge just under a week later, he was screened for pain and reported a score of "0." (Tr. at 501). However, Claimant reported having intermittent dull pressure in his abdomen post-operatively, which was alleviated by medication and rest. (Tr. at 501). He had a normal gait, no ambulatory aids, and no musculoskeletal weakness. (Tr. at 502-03). Pathology of the mass revealed papillary renal cell carcinoma, but it appeared that the cancerous tumor was confined to the kidney and had been successfully removed in its entirety. (Tr. at 786 and 1052). Claimant did well post-operatively. (Tr. at 810). He was instructed to follow up in three months, and then every six months thereafter. (*Id.*). Claimant had some right lower abdominal/flank pain in the weeks following surgery, but it lessened in severity with time. (Tr. at 813).

In March 2013, Claimant reported to a nurse practitioner at the VAMC in Bonham, Texas that he was feeling overwhelmed. (Tr. at 800). He stated that he had multiple medical issues and "no quality of life." (Tr. at 801). He had no job, car, or home, and owed the IRS $150,000. (*Id.*). Claimant reported feeling helplessness, hopelessness, and a lack of energy and motivation, and having decreased concentration and difficulty sleeping. (*Id.*). He stated that he had been depressed since August 2012. (*Id.*). He was taking Zoloft, which was prescribed by his primary care physician, but the prescription ran out a month earlier. (*Id.*). Claimant also complained of bilateral leg pain and back pain. (Tr. at 805). He exhibited a depressed mood with a congruent affect. (Tr. at 807). His sensorium, cognition, concentration, and memory were intact, and his insight and judgment were good. (Tr. at 808). Claimant's diagnosis was depressive disorder, not otherwise specified ("NOS"). (Tr. at 808). He was prescribed an antidepressant and sleep aid and was

scheduled for a follow-up appointment in two months. (Tr. at 809).

In April 2013, Claimant was evaluated by a VAMC chiropractor. (Tr. at 795). He complained of chronic mid and low back pain, which started in 2009, and left shoulder pain beginning in 2012. Claimant also had a tremor in both hands that had worsened over time. He still had left shoulder pain that consisted of tension, tightness, cramping, and pulling, but no radiating pain. (Tr. at 795).

Two months later, Claimant followed up with a psychiatrist at the VAMC in Huntington, West Virginia. (Tr. at 1510-13). He described his primary complaint as "I am hurting and frustrated, not sleeping well." (Tr. at 1510). Claimant expressed aggravation over his pain issues, stating that his quality of life was poor and he was unable to work. (Tr. at 1511). On mental status examination, Claimant's mood and affect were depressed, but his thought process and content were normal, and he was oriented in all spheres and able to concentrate. (Tr. at 1512). His insight, judgment, and impulse control were fair. (*Id.*). He was diagnosed with depression, NOS; given a Global Assessment of Functioning Score of 60;[1] and treated with an anti-depressant, mirtazapine (Remeron). (*Id.*). He was told to follow up within two months. (Tr. at 1513).

Two months later, in August 2013, Claimant followed up with his psychiatrist. (Tr. at 1490-92). He reported a poor appetite and sleep; his mood and affect were depressed; his concentration, insight, and judgment were fair; but his memory was good. (Tr. at

---

[1] The Global Assessment of Functioning ("GAF") Scale is a 100-point scale that rates "psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness," but "do[es] not include impairment in functioning due to physical (or environmental) limitations." *Diagnostic Statistical Manual of Mental Disorders*, Americ. Psych. Assoc, 32 (4th Ed. 2002) ("DSM-IV"). On the GAF scale, a higher score correlates with a less severe impairment. It should be noted that in the latest edition of the *Diagnostic and Statistical Manual of Mental Disorders*, DSM-5, the GAF scale was abandoned as a measurement tool. A GAF score between 51 and 60 indicates "Moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)." DSM-IV at 34.

1491). Claimant attributed most of his psychological symptoms to chronic pain in his back and knees. He complained that he was in constant severe pain, and he and his primary care physician did not see "eye to eye" on his pain management. (*Id.*). He added that Lortab was "not cutting it." (Tr. at 1492-93). Claimant's diagnoses were depression, NOS, and tobacco use disorder. (Tr. at 1491). He was started on Wellbutrin and his dosage of Remeron was increased. (Tr. at 1492). Claimant was instructed to follow up within three months. (*Id.*). The following month, Claimant had a primary care follow-up appointment; he had mildly limited range of motion in his hips and lumbosacral spine. (Tr. at 1482).

In November 2013, Claimant again saw a VAMC psychiatrist. (Tr. at 1470-74). He reported being depressed and feeling more anxious since starting Wellbutrin. Claimant's mental status examination was normal. (Tr. at 1471). He was diagnosed with a mood disorder secondary to general medical condition; anxiety disorder, NOS; and nicotine dependence. (Tr. at 1473). Claimant was educated about sleep hygiene and instructed to avoid tobacco. (*Id.*). His prescription of Wellbutrin was discontinued, as it made him more anxious, and he was tapered off Restoril and Remeron because they were not helping with insomnia. (Tr. at 1474). Claimant was placed on a trial of Seroquel and told to start psychotherapy, as he had some cognitive distortions that were contributing to his depression; specifically, he seemed very pessimistic. (*Id.*). Claimant was instructed to return to the clinic in one month. (*Id.*).

The following month, Claimant was seen for individual psychotherapy. (Tr. at 1462-64). He complained of increased stress, family problems, and a feeling of life not being in his control. Claimant's mental status examination was normal, except for anxious mood and affect, and fair insight and judgment. (Tr. at 1463). In January 2014, Claimant's mood and affect continued to be depressed. (Tr. at 1455). However, his thought process

was rational; he was alert and oriented; and he had fair judgment and insight. (*Id.*). He reported intermittent aching pain in his back, which he rated 7 on a 10-point pain scale. (Tr. at 1455-56).

Claimant also saw his psychotherapist and primary care provider in April. (Tr. at 1440-47). To his psychotherapist, Claimant reported having anxiety, depression, lack of motivation, chronic pain, and of being physically and emotionally fatigued. He expressed concern over his diabetes and communicated his fear of having a recurrence of cancer. (Tr. at 1445). Claimant's mental status examination was essentially normal except for depressed mood and affect, and fair judgment and insight. (Tr. at 1446). To his primary care provider, Claimant complained of chronic back pain and burning pain in his feet. (Tr. at 1441). However, on examination, Claimant had normal range of motion in all joints and no spinal or paraspinal tenderness. An x-ray of his lumbosacral spine showed loss of disc space, which was greatest at the lumbosacral junction, with facet arthritic change. (Tr. at 1313). He was diagnosed with arthritic changes without displaced fracture. (*Id.*).

At the end of the month, Claimant had a follow-up visit with his primary care physician. He had normal range of motion in his joints and no spinal or paraspinal tenderness. (Tr. at 1426). He wanted to discontinue Remeron, so he was started on Desyrel in addition to continuing Seroquel. (*Id.*). He still reported low back, bilateral hip, and foot pain, as well as diabetic neuropathy. (Tr. at 1427). He was to continue pain medications, including Lortab. (*Id.*). On April 30, 2014, Claimant's wife called and requested a cane for Claimant. (Tr. at 1424).

In May 2014, Claimant followed up with his psychiatrist. (Tr. at 1419-24). Although Claimant was no longer taking Wellbutrin, Restoril, and Remeron, and was taking Seroquel instead, he reported no improvement in his mood. (Tr. at 1420). He stated that

he still did not sleep well and had suffered from arthritis and chronic back and neck pain for the past several years. (*Id.*). Claimant indicated that his primary care provider was reducing his level of pain medication and this was making him irritable; he stated that he was at the point of taking street drugs. (*Id.*). Claimant added that he did not feel psychotherapy was helping. (*Id.*). His mental status examination was normal, including a normal mood, affect, and judgment, and his memory was grossly intact. (Tr. at 1421). Claimant's diagnosis was mood disorder secondary to general medical condition with the need to rule out dysthymic disorder; anxiety disorder, NOS; and nicotine dependence. (Tr. at 1423). The plan was to continue Seroquel, add the anti-depressant, Pamelor, and continue therapy. (*Id.*). He was to return in one month. (*Id.*). That month, Claimant was also issued a standard rollator ambulatory aid by the VAMC and was trained on its use. (Tr. at 1418).

In June 2014, Claimant presented for therapy related to unspecified anxiety disorder. (Tr. at 1412-14). He reported several family stressors, including his family's recent eviction from their residence. (Tr. at 1413). He complained about the difficulties of having to use a walker and of having memory loss. (*Id.*). Claimant's mood and affect were depressed. (*Id.*). Later that month, he reported that he was not sleeping any better, had chronic pain, and his diabetes was not well controlled. (Tr. at 1403). Claimant was very stressed because his daughter, her four children, and her boyfriend had moved in with him and his wife. (*Id.*). His mood was anxious and stressed with a congruent affect. Another anti-depressant, Effexor, was added to his medication regimen. (Tr. at 1406).

At psychotherapy in July 2014, Claimant reported ongoing pain with his back and hips, which he rated 8 out of 10 and was not relieved by Lortab. (Tr. at 1399). He complained that his daughter and her four children continued to live with him while they

waited for housing; Claimant described avoiding them by isolating in his bedroom. (*Id.*). On mental status examination, his mood and affect were anxious, and his insight and judgment were fair. (Tr. at 1400). Claimant was diagnosed with unspecified anxiety disorder. (*Id.*). At an appointment later than month, Claimant reported that Effexor was making his depression worse; thus, he was instructed to taper his use of the medication over the next week and then discontinue it. (Tr. at 1391). He expressed feelings of upset over his current living situation, with four adults and four children staying in a two-bedroom apartment. He also complained of pain in his back and hips that affected his mood, sleep, and functioning. (*Id.*). Claimant exhibited a depressed mood with a congruent affect. (Tr. at 1393). He reported trouble with concentration and memory, but his judgment and insight were good. (*Id.*). Claimant's diagnosis was depressive disorder, NOS. (*Id.*). Claimant was instructed to continue taking Pamelor for mood and Desyrel for sleep and to return the following month. (Tr. at 1394).

When Claimant returned in August 2014, he reported feeling pain 24/7, impatience, and isolation. (Tr. at 1595-600). He remarked that he had no quality of life. Claimant also complained of difficulty walking due to leg pain and muscle weakness, stating that his pain medication was inadequate to control his symptoms. He asked for a referral to a pain management clinic. Claimant's mental status examination revealed a depressed mood and affect. In addition, his body seemed to shake with pain, and he was observed to have difficulty walking. Cymbalta was added to his medications.

In October 2014, Claimant reported feeling less agitated and anxious with the use of Cymbalta. (Tr. at 1591). His mood and affect were depressed, thought processes rational, and his insight and judgment were fair. (*Id.*). His chronic pain and family issues persisted. At a subsequent visit that month, Claimant's mood was depressed and his affect

was flat. (Tr. at 1579). He was observed to be short of breath, walking very slowly and was using his rolling walker. (*Id.*). Claimant stated that he had lost 20 pounds and was staying in bed a lot. His sleep was restless and his energy level was low. Claimant's mental status examination was essentially the same as before, although his affect was constricted and he spoke in a monotone. (Tr. at 1580). Claimant's dosages of Cymbalta and Desyrel were increased. (Tr. at 1581). He was encouraged to come out of his room and interact more with his family. (*Id.*).

Finally, in November 2014, Claimant had an individual therapy session. His mood and affect were irritable. (Tr. at 1576). His thought process was rational, and his insight and judgment were limited. (*Id.*). Claimant expressed great frustration with his pain control. However, when offered a referral for inpatient mental health treatment, Claimant declined. Later during the session, Claimant expressed his desire to stop psychotherapy altogether.

### B. Evaluations and Opinions

In April 2013, Claimant was evaluated by agency consultant, Mahmood Panjwani, M.D. Claimant's chief complaints included chronic low-to-mid back pain, right hip pain, chronic left shoulder pain, chronic obstructive pulmonary disease ("COPD"), and diabetes mellitus with associated symptoms. (Tr. at 1265). He described his back pain as averaging 7 on a 10-point pain scale, causing him to have trouble sitting, standing, and walking for more than 30 minutes at a time. He was required to keep shifting and could not get comfortable. Claimant also indicated that his back pain interfered with his ability to push, pull, bend, stoop, and squat. His hip pain also affected his ability to stand, walk, squat, and kneel; and his shoulder pain prevented him from lifting more than 30 pounds, and impaired his ability to push, pull, and reach. Claimant stated that he previously worked

as a truck driver, but stopped working in May 2012. (Tr. at 1266). At the time of the evaluation, Claimant's medications included Metformin and Glipizide for diabetes; aspirin; a laxative; Restoril for sleep; Zoloft for depression; Flexeril and Hydrocodone for musculoskeletal pain; Prilosec for gastrointestinal issues; and Prevastatin, Norvasc, and Nitrostat for cardiac issues. On examination, Claimant presented himself as being in distress, walking slowly with a slightly bent-over posture. (Tr. at 1267). He reported extreme discomfort in his lower back when getting on and off the examination table and when lying and sitting up on the table. (*Id.*). He stated that he usually walked with a cane, but had not brought it that day. (*Id.*). Claimant was measured at 6 feet tall and weighed 197 pounds. His neurological examination was normal, with 5/5 muscle strength in all muscle groups tested, normal finger movements, and no evidence of atrophy. His musculoskeletal examination revealed that Claimant was unable to bend down fully and could not get up independently from a squatting position. (Tr. at 1268). He had difficulty standing, but was able to stand and walk on his heels and walk in a straight line. He had mild crepitus in both knees without any acute findings. (*Id.*). Claimant also had decreased range of motion in his left shoulder. (*Id.*). Dr. Panjwani diagnosed Claimant with chronic low-to-mid back pain with associated limitations; chronic hip pain, possibly related to degenerative joint disease; chronic left shoulder pain with decreased range of motion that was affecting normal use of his left arm, which was possibly caused by a partial rotator cuff tear or impingement syndrome; COPD with history of cigarette smoking and difficulty breathing on overexertion; and diabetes mellitus with symptoms consistent with diabetic neuropathy. (Tr. at 1269). He was also being treated for high blood pressure and high cholesterol and suffered from anxiety and depression. (*Id.*).

The same month, J. Lawrence Muirhead, Ph.D., performed a consultative

psychological examination of Claimant. (Tr. at 1278-81). Claimant reported that he was disabled due to depression and had been treated for the condition since January 2013, when he became acutely despondent in conjunction with physical complaints, unemployment, and the loss of his vehicle. (Tr. at 1278). Claimant stated that despite his current treatment with Zoloft and Restoril, his depression had not improved. (*Id.*). Claimant's current symptoms included low energy level, erratic sleep, variable appetite, impaired concentration, episodic weeping episodes, and periods of situational anxiety. He exhibited a depressed mood and restricted affect. (*Id.*). Claimant's gait was markedly impaired, which he stated was due to chronic and debilitating lumbar pain, but he walked without assistance. (Tr. at 1279). Claimant reported graduating from high school, serving in the military, and working fifteen years as a commercial truck driver. Claimant was currently living with his mother for financial reasons. He stated that he could perform grooming and hygiene activities without assistance, could do light-duty household tasks, spent time on the computer, and occasionally read. However, he did not socialize much or participate in any group activities. He was suspicious and distrustful, particularly of doctors, who "can put you away." (Tr. at 1280). Dr. Muirhead felt Claimant's lifelong difficulty with socialization reflected a personality disorder. (*Id.*).

On mental status examination, Claimant's speech was normal, although mildly subdued, and he was cooperative with good rapport. (*Id.*). His thought processes were occasionally interrupted by lapses in concentration. (*Id.*). Testing showed a concentration impairment and compromised short-term memory function. (*Id.*). Claimant's thought processes were also mildly improvised in content and appeared to function in the low average range of intelligence. (*Id.*). His judgment appeared significantly compromised by depressive mood and affective restriction. (*Id.*). Claimant had a noticeable, albeit mild,

tremor in his hands, but his fine motor skills appeared intact. Dr. Muirhead diagnosed Claimant with dysthymic disorder and personality disorder. (Tr. at 1281). He had contributor psychological stressors. Claimant's GAF score was 58, based upon depressive mood, affective restriction, concentration impairment, erratic sleep, and social isolation. (*Id.*).

On April 23, 2013, consultative psychiatrist, Leela Reddy, M.D., reviewed Claimant's records. She determined that he had a severe affective disorder, which was secondary to his physical condition, as well as a personality disorder. (Tr. at 95). Under paragraph B criteria, Dr. Reddy found Claimant to have mild restriction in activities of daily living and social functioning; moderate restriction in maintaining concentration, persistence, or pace; and no episodes of decompensation of extended duration. (*Id.*). She found no evidence of paragraph C criteria. In support of her findings, Dr. Reddy explained that although Claimant reported being treated for depression by his primary care provider, he otherwise had no past contact with a psychiatrist or psychologist and no past psychiatric hospitalizations. (*Id.*). Ultimately, she concluded that his alleged limitations were not fully supported by the medical evidence of record. (*Id.*).

Dr. Reddy also completed a Mental Residual Functional Capacity Evaluation. (Tr. at 101-02). She determined that Claimant was not significantly limited in his ability to remember locations and work-like procedures; understand, remember, and carry out short simple instructions; perform within a schedule, appear regularly, and be punctual; work in coordination with and in proximity to others without distraction; and make simple work-related decisions. He was moderately limited in his ability to understand, remember, and carry out detailed instructions; maintain attention and concentration for extended periods; complete a normal workday and work week without interruptions from

psychologically based symptoms; and perform at a consistent pace without an unreasonable number and length of rest periods. In summary, Dr. Reddy stated that Claimant was able to understand, remember, and carry out detailed, but not complex instructions; make basic decisions; concentrate for extended periods, interact with others; and respond to changes. (*Id.*).

On the same date, Maryam Saif, M.D., assessed Claimant's physical residual functional capacity. Dr. Saif found that Claimant was limited to light work with additional postural limitations of only occasional climbing of ramps, stairs, ladders, ropes, and scaffolds; stooping; and crouching. (Tr. at 99). He was also limited to occasional reaching overhead with his left arm. (Tr. at 99-100). Overall, Dr. Saif found that Claimant's alleged limitations were partially supported by the medical evidence of record and other evidence, but Claimant was expected to be disabled for less than 12 months and could perform his past relevant work as a truck driver. (Tr. at 100 and 103).

In July 2013, on reconsideration, consultative psychiatrist Veena Ghai, M.D., reviewed Claimant's records. Dr. Ghai disagreed with the prior assessment, finding that Claimant had a moderate, not mild, restriction in maintaining social functioning. (Tr. at 114). She otherwise agreed with Dr. Reddy that Claimant was mildly limited in activities of daily living; moderately limited in maintaining concentration, persistence, or pace; and had no episodes of decompensation of extended duration. (*Id.*). Dr. Ghai also agreed that Claimant was only partially credible. (*Id.*). Further, Dr. Ghai agreed with the other portions of the mental RFC assessment, except she found more severe social and adaptive limitations, including that Claimant was moderately limited in his ability to work in coordination with or in proximity to others without being distracted by them, interact appropriately with the general public, accept instructions and respond appropriately to

criticism from supervisors, and respond appropriately to changes in work setting. (Tr. at 119-20). However, Dr. Ghai reiterated Dr. Reddy's opinion that Claimant was able to understand, remember, and carry out detailed, but not complex instructions; make basic decisions; concentrate for extended periods; interact with others and respond to changes. (Tr. at 121). On the same date, John Durfor, M.D., affirmed the prior physical RFC assessment prepared by Dr. Saif. (Tr. at 117-19).

## VI.  Scope of Review

The issue before the Court is whether the final decision of the Commissioner is based upon an appropriate application of the law and is supported by substantial evidence. *See Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). In Blalock v. Richardson, the Fourth Circuit Court of Appeals defined "substantial evidence" to be:

> [E]vidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."

483 F.2d 773, 776 (4th Cir. 1973) (quoting *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966)). When examining the Commissioner's decision, the Court does not conduct a *de novo* review of the evidence to ascertain whether the claimant is disabled. *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005) (citing *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996)). Instead, the Court's role is limited to insuring that the ALJ followed applicable regulations and rulings in reaching his decision, and that the decision is supported by substantial evidence. *Hays*, 907 F.2d at 1456. If substantial evidence exists, the Court must affirm the Commissioner's decision "even should the court disagree with such decision." *Blalock*, 483 F.2d at 775.

# VII. Discussion

## A. Mental Impairments

In his first challenge to the Commissioner's decision, Claimant asserts that the ALJ erred by failing to fully analyze the conflicting evidence regarding Claimant's mental impairments. As a result of that error, the ALJ incorrectly concluded that the impairments were not severe. According to Claimant, this step two error was never corrected, because the ALJ failed to address the functional impact of Claimant's mental impairments at any subsequent step in the disability determination process. Therefore, Claimant argues that the Commissioner's decision should be reversed and remanded.

At the second step of the sequential evaluation process, the ALJ determines whether the claimant has an impairment or combination of impairments that is severe. 20 C.F.R. §416.920(a)(4)(ii). An impairment is considered "severe" if it significantly limits a claimant's ability to do work-related activities. 20 C.F.R. §416.921(a). The claimant bears the burden of proving that an impairment is severe, *Grant v. Schweiker,* 699 F.2d 189, 191 (4th Cir. 1983), and does this by producing medical evidence establishing the condition and its effect on the claimant's ability to work. *Williamson v. Barnhart,* 350 F.3d 1097, 1100 (10th Cir. 2003). The mere presence of a condition or ailment is not enough to demonstrate the existence of a severe impairment. Moreover, to qualify as a potentially disabling impairment, the impairment must have lasted, or be expected to last, for a continuous period of at least twelve months, 20 C.F.R. § 416.909, and must not be controlled by treatment, such as medication. *Gross v. Heckler,* 785 F.2d 1163, 1166 (4th Cir. 1986). If the ALJ determines that the claimant does not have a severe impairment or combination of impairments, a finding of nondisability is made at step two, and the process comes to an end. On the other hand, if the claimant has at least one

impairment that is deemed severe, the process moves on to the third step. "[T]he step-two inquiry is a de minimis screening device to dispose of groundless claims." *Smolen v. Chater,* 80 F.3d 1273, 1290 (9th Cir.1996) (citing *Bowen v. Yuckert,* 482 U.S. 137, 153-54, (1987)); *see also Felton–Miller v. Astrue,* 459 F. App'x 226, 230 (4th Cir. 2011) (per curiam) ("Step two of the sequential evaluation is a threshold question with a de minimis severity requirement.").

Here, the ALJ found that Claimant had several severe impairments; accordingly, the sequential process proceeded to step three. From that perspective, as the Commissioner contends, even if the ALJ erred by not considering Claimant's mental impairments to be severe, Claimant suffered no harm because the outcome at step two was the same. Claimant's application for benefits moved on to the next step in the sequence. Courts in this circuit have held that failing to list a severe impairment at the second step of the process generally is not reversible error as long as any functional effects of the impairment are appropriately considered during the later steps of the process. *See Lewis v. Astrue*, 937 F. Supp. 2d 809, 819 (S.D. W. Va. 2013) (applying harmless error standard where ALJ proceeded to step three and considered non-severe impairments in formulating claimant's RFC); *McKay v. Colvin,* No. 3:12–cv-1601, 2013 WL 3282928, at *9 (S.D. W. Va. Jun. 27, 2013); *Cowan v. Astrue,* No. 1:11-cv-7, 2012, WL 1032683, at *3 (W.D.N.C. Mar. 27, 2012) (collecting cases); *Conard v. Comm'r*, Case No. SAG-12-2290, 2013 WL 1664370, at *2 (D. Md. Apr. 16, 2013) (finding harmless error where Claimant made threshold of severe impairment regarding other disorders and "the ALJ continued with the sequential evaluation process and considered all of the impairments, both severe and non-severe, that significantly impacted [his] ability to work"); *Cook ex rel A.C. v. Colvin*, Case No. 2:11-cv-362, 2013 WL 1288156, at *4 (E.D. Va. Mar. 1, 2013) ("The failure

of an ALJ to find an impairment to be severe at Step 2, however, is harmless if the ALJ finds the claimant to suffer from another severe impairment, continues in the evaluation process, and considers the effects of the impairment at the other steps of the evaluation process."); *Mauzy v. Astrue,* No. 2:08–cv–75, 2010 WL 1369107, at *6 (N.D. W. Va. March 30, 2010) ("This Court finds that it was not reversible error for the ALJ not to designate any of the plaintiff's other mental conditions as severe or not severe in light of the fact that he did, during later steps of the sequential evaluation process, consider the combined effect of all of the plaintiff's impairments."). A number of federal courts of appeal have agreed with this approach. *Jerome v. Colvin*, 542 F. App'x 566, 566 (9th Cir. 2013); *Gray v. Comm'r of Soc. Sec.*, 550 F. App'x 850, 853-54 (11th Cir. 2013); *Reices-Colon v. Astrue*, 523 F. App'x 796, 798 (2d Cir. 2013); *Henke v. Astrue*, 498 F. App'x 636, 640 (7th Cir. 2012); *Schettino v. Comm'r of Soc. Sec.*, 295 F. App'x 543, 545 n.4 (3d Cir. 2008); *Hill v. Astrue*, 289 F. App'x 289, 292 (10th Cir. 2008); *Maziarz v. Sec. of Health & Human Servs.*, 837 F.2d 240, 244 (6th Cir. 1987).

Nevertheless, the undersigned **FINDS** that the ALJ erred by failing to conduct a full assessment of Claimant's mental impairments at step two of the process, and then compounded the error by failing to consider the functional effects of Claimant's mental impairments at the subsequent steps of the sequential evaluation. (Tr. at 32-40). Starting with step two, the ALJ's analysis was deficient, because he never examined and resolved obvious conflicts in the record regarding the severity of Claimant's mental impairments. The ALJ's failure to explicitly discuss substantial contradictory evidence and explain how he reconciled the differences begs the question of whether the ALJ actually performed that mandatory task.

At step two of the sequential evaluation, the ALJ addressed Claimant's

"depression/dysthymia and personality disorder not otherwise specified," noting that Claimant's treatment was "sporadic until more recently" and that the mental conditions appeared to be closely related to Claimant's economic and living situations. (Tr. at 33). Further, the ALJ stated that records from October 2, 2014 indicated that Claimant was not as agitated or anxious when he used Cymbalta. (*Id.*). Based upon this evidence, the ALJ determined that Claimant's mental impairments did not significantly affect his ability to perform basic work activities or meet the durational requirement of the Social Security Act.

The ALJ then applied the special technique, rating the severity of Claimant's mental impairments by using the four broad functional categories found in paragraph B. The ALJ acknowledged the findings of non-examining agency psychiatrists, Drs. Reddy and Ghai, that Claimant had moderate difficulties in maintaining concentration, persistence, or pace; could not understand, remember, and carry out complex instructions; and could not make anything more complicated than basic decisions. (*Id.*). However, the ALJ afforded these opinions little weight, because Drs. Reddy and Ghai "did not have the chance to review all of the medical evidence contained in the current record" and, again, because Claimant's psychiatric treatment was sporadic and his psychological symptoms appeared situational. (*Id.*). The ALJ proceeded to evaluate Claimant's "paragraph B" criteria, ultimately concluding that Claimant was only mildly limited in the first three functional categories and had no episodes of decompensation. He based his finding regarding Claimant's concentration, persistence, and pace largely upon an Adult Function Report prepared by Claimant in February 2013 in which he stated that he could "pay bills, count change, handle a savings account, and use a checkbook. He also indicated that he can finish what he starts and does okay at following written instructions." (Tr. at

33-34).

Although the ALJ considered Claimant's mental impairments at step two and followed the special technique, he overlooked significant evidence that was inconsistent with his findings. First, as Claimant emphasizes, all three agency consultants agreed that Claimant had more than mild impairment in maintaining concentration, persistence, or pace. While the ALJ explicitly disregarded the opinions of Dr. Reddy and Dr. Ghai, he never actually weighed the opinion of Dr. Muirhead, who was the only consultant to have examined Claimant. Furthermore, the ALJ's stated reason for rejecting the opinions of Dr. Reddy and Dr. Ghai is confusing at best. The ALJ explained that he gave the opinions little weight, because Dr. Reddy and Dr. Ghai "did not have a chance to review all of the medical evidence contained in the current record." (Tr. at 33). However, when juxtaposed with the ALJ's observation that Claimant's mental health treatment became more frequent in the period *after* the consultants performed their reviews, the ALJ's rationale makes little sense. Rather than providing a basis to change their opinions, a record of increased mental health treatment likely would have corroborated the opinions.

With respect to Dr. Muirhead, the ALJ never reconciled his own findings with those of Dr. Muirhead, who after conducting a battery of psychological tests, opined that Claimant's concentration, short-term memory, and thought processes were impaired and that Claimant had a personality disorder reflected by lifelong difficulties with socialization. (Tr. at 1280). The Commissioner suggests in a footnote within her brief that the ALJ's reasons for rejecting the opinions of Drs. Reddy and Ghai also applied to Dr. Muirhead's opinions. (ECF No. 11 at 10). While one could speculate that the ALJ gave little weight to Dr. Muirhead's opinions for the same reasons that he rejected the findings of Drs. Reddy and Ghai, that analysis of Dr. Muirhead's evaluation is not expressed

27

anywhere in the decision. Indeed, the ALJ did not state if and how he weighed Dr. Muirhead's opinions, nor elucidated if and how Dr. Muirhead's opinions factored into the RFC finding. Other than referencing Dr. Muirhead's report as the source of a few statements made by Claimant, the ALJ virtually ignored Dr. Muirhead's evaluation.

Equally as problematic, although the ALJ relied heavily on the Adult Function Report, he never acknowledged blatant inconsistencies in the report that undermined his conclusion regarding Claimant's ability to maintain concentration, persistence, or pace. While Claimant indicated that he could manage financial tasks, finish what he started, and follow written instructions, he also stated in the same function report that: he needed reminders to take his medicine; he could pay attention except when he was pain; he could not follow oral instructions; he forgot things easily; and his impairments affected his memory, completion of tasks, concentration, understanding, and ability to follow instructions. (Tr. at 280-87).

Similarly, the ALJ failed to discuss Claimant's mental health treatment records, except to state later in the written decision that he rejected the documented GAF scores and, instead, "g[ave] more weight to the objective details and chronology of the record." (Tr. at 38). However, the ALJ never identified the specific "objective details" that were entitled to more weight and never explained how the "chronology of the record" supported a conclusion that Claimant had only mild limitations in social functioning, persistence, concentration, or pace. In addition to the consultants' opinions, the ambiguous function report, and Claimant's statements, there were clinical entries in the treatment records that documented or substantiated Claimant's repeated reports of memory loss and inability to concentrate. (Tr. at 801, 1278, 1280, 1393, 1400, 1413, 1490, 1511, 1526, 1594, 1598). These were not addressed.

Put simply, the record presents ambivalent evidence; it is not so one-sided that explanation is unnecessary. As such, the undersigned cannot conclude that the ALJ's failure to reconcile the inconsistent evidence at step two of the process was harmless error. All three of the state experts collectively found that Claimant had some degree of mental limitation. Of the three experts, Dr. Muirhead personally examined and tested Claimant. Yet, the ALJ only hastily dismissed the non-examining psychiatrists' findings and ignored Dr. Muirhead's report almost entirely. More importantly, the ALJ never addressed the functional impact of Claimant's mental impairments later in the sequential process. Because specific functional limitations were found by the state experts, which ostensibly played a role in the disability determination, the ALJ was obligated to assess those functions, fully discuss the relevant conflicting evidence, and articulate his rationale for not including any mental limitations in Claimant's RFC. *See* SSR 96-8p ("The RFC assessment must always consider and address medical source opinions. If the RFC assessment conflicts with an opinion from a medical source, the adjudicator must explain why the opinion was not adopted." *Mascio v. Colvin*, 780 F.3d 632, 636 (4th Cir. 2015) ("[r]emand may be appropriate … where an ALJ fails to assess a claimant's capacity to perform relevant functions, despite contradictory evidence in the record, or where other inadequacies in the ALJ's analysis frustrate meaningful review") (citation omitted).

It is well established that an ALJ need not discuss every function or every piece of evidence. *Mascio*, 780 F.3d at 636 (holding that an ALJ need not discuss functions that are "irrelevant or uncontested"); *Reid v. Commissioner of Soc. Sec.*, 769 F.3d 861, 865 (4th Cir. 2014). However, an ALJ must discuss conflicting evidence that is critical to the outcome of the case. A reviewing court cannot extrapolate the ALJ's rationale of the evidence from a scant analysis. Given the discrepancy between the ALJ's RFC finding and

significant portions of the evidence, the ALJ was required to resolve the conflicts, articulate his analysis, and cite evidentiary support for his conclusions. SSR 96-8p, 1996 WL 374184, at *7 (the ALJ must "explain how any material inconsistencies or ambiguities in the evidence in the case record were considered and resolved."). It is undeniable that Claimant's purported mental limitations were influential to the ultimate decision of whether Claimant was disabled. During the administrative hearing, the ALJ asked the vocational expert if a hypothetical individual of Claimant's age, education, and employment background, who had the physical and environmental limitations that the ALJ ultimately incorporated into Claimant's RFC finding, was capable of gainful employment. (Tr. at 84-85). After the vocational expert listed occupations that the hypothetical individual could perform, the ALJ questioned if that hypothetical individual could work if he was additionally limited to being "off task on an average of 60 to 90 minutes a day over and above scheduled breaks." (Tr. at 86). The expert responded that such person could not work. (*Id.*). The ALJ then alternatively questioned if the hypothetical individual could work if he was absent from work, due to pain and the need to socially isolate, two to three days per month. (Tr. at 87). Again, the expert responded that such an individual could not work. (*Id.*).

Clearly, Claimant's ability to concentrate and remain on task, function socially, and perform other related tasks were determinative of his ability to engage in substantial gainful activity. Yet, despite the vocational expert's testimony, the ALJ failed to resolve apparent discrepancies between the medical opinions in the record and his RFC finding. Although the ALJ may well have been able to explain why Claimant had no mental limitations in his RFC and provide support for his decision, the Court "cannot begin to engage in a 'meaningful review' when there is nothing on which to base a review." *Fox v.*

*Colvin*, 632 F. App'x 750, 755 (4th Cir. 2015). As stated in *Fox, supra*, "[o]ur circuit precedent makes clear that it is not [the Court's] role to speculate as to how the ALJ applied the law to its findings or to hypothesize the ALJ's justifications that would perhaps find support in the record." *Id.* Moreover, the Court is not in the position to substitute its analysis for that of the ALJ. *Id.* Given the contradictory evidence, the ALJ should have provided a more robust analysis of Claimant's alleged mental impairments that allowed for meaningful review.

Accordingly, the undersigned **FINDS** that the Commissioner's decision is not supported by substantial evidence. Accordingly, the undersigned **RECOMMENDS** that the Commissioner's decision be **REVERSED** and that this case be **REMANDED** so that the ALJ may reconsider, or elaborate on the discussion of, Claimant's mental impairments and functional limitations.

### B. Claimant's RFC and Use of an Ambulatory Aid

In his second challenge to the Commissioner's decision, Claimant disputes the ALJ's finding that he could perform light work, arguing that it was precluded by his need to use a cane or walker to ambulate. (ECF No. 10 at 15-17). Above, the undersigned recommended that this case be remanded for further analysis of Claimant's mental impairments; therefore, an exhaustive discussion of this challenge is unnecessary. Nonetheless, the undersigned finds that the ALJ complied with the applicable rules and regulations in analyzing Claimant's use of an ambulatory aid.

While Social Security Ruling (SSR) 96-9P concerns individuals capable of less than a full range of sedentary work, district courts within the Fourth Circuit consistently rely on it for guidance when a claimant alleges that a hand-held assistive device was not properly considered in his or her RFC determination. *See Smith v. Colvin*, No. 4:15-CV-

00175-RN, 2017 WL 27942, at *5 (E.D.N.C. Jan. 3, 2017); *Fletcher v. Colvin*, No. 1:14-CV-380, 2015 WL 4506699, at *8 (M.D.N.C. July 23, 2015); *Wimbush v. Astrue*, No. 4:10-CV-00036, 2011 WL 1743153, at *2–3 (W.D. Va. May 6, 2011); *Morgan v. Comm'r, Soc. Sec.*, CIV. No. JKB-13-2088, 2014 WL 1764922, at *1 (D. Md. Apr. 30, 2014); *Timmons v. Colvin*, No. 3:12CV609, 2013 WL 4775131, at *7–8 (W.D.N.C. Sept. 5, 2013); *Hamlin v. Colvin*, No. 8:12-CV-3601-RMG-JDA, 2014 WL 587464, at *13–14 (D.S.C. Jan. 23, 2014), *report and recommendation adopted*, No. 8:12-3601-RMG, 2014 WL 588073 (D.S.C. Feb. 14, 2014). Pursuant to SSR 96-9P, an ALJ must consider the impact of a "medically required" hand-held assistive device on a claimant's RFC. A hand-held assistive device is "medically required" if "medical documentation establish[es] the need for a hand-held assistive device to aid in walking or standing, and describing the circumstances for which it is needed." *Smith*, 2017 WL 27942, at *5 (citing SSR 96–9p, 1996 WL 374185, at *7). Importantly, "[a] prescription or the lack of a prescription for an assistive device is not necessarily dispositive of medical necessity." *Fletcher*, 2015 WL 4506699, at *8 (citing *Staples v. Astrue,* 329 F. App'x 189, 191–92 (10th Cir. 2009); *see also Crocker v. Colvin*, No. 1:15-CV-1215, 2016 WL 1626591, at *19 (E.D. Va. Apr. 21, 2016) ("Courts in the Fourth Circuit have held that even where a claimant is prescribed a cane, substantial evidence may support a conclusion that the cane is not medically necessary, and as such, an ALJ's decision not to consider the impact of a claimant's cane use on her residual functional capacity is not error.") (collecting cases); *Morgan*, 2014 WL 1764922, at *1. Moreover, if an ALJ finds that an assistive device, such as a cane or walker, is not "medically necessary," the ALJ is not required to include the use of the cane or walker in the claimant's RFC. *Fletcher*, 2015 WL 4506699, at *8.

Here, the ALJ considered Claimant's use of an hand-held assistive device, finding

that "[w]hile the claimant testified that the VA allowed him a walker, there was no evidence showing musculoskeletal or neurological deficits such that a walker, or even a cane, would be required." (Tr. at 37). The ALJ's discussion of the evidence supports this conclusion. The ALJ noted that Claimant's MRI of his lumbar spine in February 2013 showed only mild degenerative changes of spondylosis at L5-S1 without evidence of neural impingement or displacement. (*Id.*). Further, the ALJ cited that Claimant did not use an assistive device on the date of his consultative examination in April 2013 and although Claimant walked slowly and slightly bent over, he had full motor strength in all muscle groups, as well as symmetrical and normal sensory examination. (*Id.*). Claimant had difficulty standing and walking on his toes, but was able to stand and walk on his heels and walk in a straight line. (*Id.*).

Additional evidence in the record substantially supports the ALJ's finding that Claimant's assistive device was not "medically required," was not required to be incorporated into his RFC, and did not preclude him from light work. In August 2012, shortly after his alleged onset of disability, although Claimant appeared "frail," he walked without an assistive device. (Tr. at 357). In November 2012, Claimant presented with a "new complaint" of back pain without radiculopathy over the past six months, but the x-ray of his thoracic spine was normal and the x-ray of his lumbar spine showed minimal arthritic changes. (Tr. at 1210-11). In January 2013, Claimant complained of having mid-to-low back pain since 2009, but he had normal gait, station, and coordination. (Tr. at 465). He displayed mildly decreased range of motion in his cervical spine and trunk and muscle spasm in his cervical spine. (Tr. at 468 and 470). However, his MRI of his lumbar spine the following month showed only mild degenerative changes of spondylosis at L5-S1 without evidence of neural impingement or displacement, as noted by the ALJ. (Tr. at

407). There was no significant abnormality of his thoracic spine and no significant thecal sac or neural foraminal narrowing of either his lumbar or cervical spine. (Tr. at 407 and 409). In February and March 2013, Claimant had a normal gait and did not use an ambulatory aid. (Tr. at 502-03 and 942). In September 2013, he had mildly limited range of motion in his lumbosacral spine. (Tr. at 1482). In April 2013, Claimant stated during his consultative examination that he usually walked with a cane, but did not bring it that day. (Tr. at 1267). He presented himself in distress, walking slowly with a slightly bent over posture, but he could bend down fully and squat. (Tr. at 1267-68). One year later, although he still reported low back pain, Claimant had normal range of motion in his joints and no spinal or paraspinal tenderness. (Tr. at 1426). In May 2014, Claimant received a standard rolling walker. (Tr. at 1418). In October 2014, when seen for mental health follow up, he was observed walking very slowly using his walker. (Tr. at 1579). Yet, there are no objective medical examinations or testing from that time period, or any other time period, explaining Claimant's need for a walker.

"When reviewing a Social Security disability determination, a reviewing court must 'uphold the determination when an ALJ has applied correct legal standards and the ALJ's factual findings are supported by substantial evidence.'" *Cuffee v. Berryhill*, No. 15-2530, 2017 WL 715070, at *2 (4th Cir. Feb. 23, 2017) (citations omitted). Substantial evidence is that which "a reasonable mind might accept as adequate to support a conclusion" and it "consists of more than a mere scintilla of evidence but may be less than a preponderance." *Id.* (citation omitted). Significantly, in reviewing for substantial evidence, the court must not "undertake to reweigh conflicting evidence, make credibility determinations, or substitute our judgment for that of the [ALJ]" and "[w]here conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the

responsibility for that decision falls on the [ALJ]." *Id.* Furthermore, the ALJ is solely responsible for assessing a claimant's RFC. 20 C.F.R. §§ 404.1546(c) and 416.946(c).

Under the deferential "substantial evidence" standard, the undersigned finds that the record in this matter supports the ALJ's physical RFC assessment and analysis of the medical evidence concerning Claimant's use of a walker. Although Claimant was issued a walker, the evidence fails to establish that it was medically required. Indeed, one month prior to being issued the walker, he presented to his consultative examination without any ambulatory aid, stating that he usually used a cane, but left it at home. (Tr. at 1267). The undersigned agrees that there are no objective examinations or testing which clearly demonstrate Claimant's need for a hand-held assistive device or the circumstances for which he would need it. Furthermore, despite Claimant's allegations and purported use of a cane, the evidence does not conclusively show that Claimant was precluded from light work. Where, as here, the ALJ considered the relevant evidence, including Claimant's use of a walker, applied the correct law, and fully articulated the RFC analysis as supported by the medical evidence of record, the Court is not in the position to second-guess the ALJ's determination. Therefore, the undersigned **FINDS** that the ALJ's physical RFC determination is supported by substantial evidence.

## VIII.  Recommendations for Disposition

Based on the foregoing, the undersigned United States Magistrate Judge respectfully **PROPOSES** that the presiding District Judge confirm and accept the findings herein and **RECOMMENDS** that the District Judge **GRANT** Plaintiff's Brief in Support of Judgment on the Pleadings, (ECF No. 10), to the extent that it requests remand of the Commissioner's decision; **DENY** Defendant's request to affirm the decision of the Commissioner, (ECF No. 11); **REVERSE** the final decision of the Commissioner;

**REMAND** this matter pursuant to sentence four of 42 U.S.C. § 405(g) for further administrative proceedings consistent with this PF&R; and **DISMISS** this action from the docket of the Court.

The parties are notified that this "Proposed Findings and Recommendations" is hereby **FILED**, and a copy will be submitted to the Honorable Joseph R. Goodwin, United States District Judge. Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rules 6(d) and 72(b), Federal Rules of Civil Procedure, the parties shall have fourteen days (filing of objections) and three days (mailing) from the date of filing this "Proposed Findings and Recommendations" within which to file with the Clerk of this Court, specific written objections, identifying the portions of the "Proposed Findings and Recommendations" to which objection is made, and the basis of such objection. Extension of this time period may be granted by the presiding District Judge for good cause shown.

Failure to file written objections as set forth above shall constitute a waiver of *de novo* review by the District Court and a waiver of appellate review by the Circuit Court of Appeals. *Snyder v. Ridenour*, 889 F.2d 1363 (4th Cir. 1989); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984). Copies of such objections shall be provided to the opposing party, Judge Goodwin, and Magistrate Judge Eifert.

The Clerk is directed to file this "Proposed Findings and Recommendations" and to provide a copy of the same to counsel of record.

**FILED:** April 17, 2017

Cheryl A. Eifert
United States Magistrate Judge